SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**H.C. Equities, LP v. County of Union (A-1/2-20) (084556)**

**Argued February 2, 2021 -- Decided July 19, 2021**

**PATTERSON, J., writing for a unanimous Court.**

In this appeal, the Court considers whether plaintiff H.C. Equities' claims against defendants, the County of Union and the Union County Improvement Authority (Authority), were properly dismissed by the trial court pursuant to the notice of claim provisions of the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 to :12.3.

In December 1998, H.C. Equities leased to the County two buildings for a term of twenty-five years. In July 2012, the County ceased making rental payments, citing the alleged neglect of the properties and damage from an electrical fire. In December 2013, H.C. Equities filed an action for breach of lease, but it later agreed to the dismissal of its action without prejudice pending the conclusion of settlement negotiations.

In October 2015, the Authority retained a real estate consultant, Colliers International (Colliers), to assess the County's real estate needs. Colliers provided an initial report dated January 20, 2017, and a second report dated September 19, 2017. H.C. Equities stated that it obtained a copy of the first report in "early 2017." In that report, Colliers identified "[s]ubstantial disadvantages" in the buildings leased from H.C. Equities and recommended that the County "[e]xit [the] building."

On February 22, 2017, H.C. Equities' outside counsel sent a letter to County Counsel and the Authority's outside counsel, alleging that the January 20 report was "informed and influenced by parties acting in bad faith and with the intention of seeing the settlement fail." The letter also "advised that if the draft Collier Study is not withdrawn, then H.C. Equities . . . will likely proceed with its original claims . . . and prosecute additional causes of action . . . including" several tort claims. H.C. Equities' counsel sent a second letter dated March 8, 2017 addressed to outside counsel for the Authority, with a copy sent to County Counsel, and a third letter, sent on March 9, 2017 by a second law firm to County Counsel.

On June 13, 2017, H.C. Equities, represented by a third law firm, served on the County a "Notice of Tort Claim" pursuant to the Tort Claims Act. H.C. Equities provided a copy of that Notice to outside counsel for the Authority.

1

H.C. Equities filed this action against the County and the Authority on April 23, 2018. It asserted claims against the County for breach of lease, claims pertaining to the alleged settlement agreement, conspiracy, and promissory estoppel. H.C. Equities asserted claims against the Authority for trade libel, defamation, and conspiracy.

The Authority moved to dismiss all claims asserted against it, contending that H.C. Equities had failed to provide a timely notice of tort claims. H.C. Equities cross-moved "for retroactive extensions of time for filing of its Notice under the [Tort Claims] Act," asserting that its cause of action against the Authority did not accrue on the date it received the January 20, 2017 report because the County and the Authority committed a continuing tort that extended beyond the receipt of that report. In the alternative, H.C. Equities argued that there were extraordinary circumstances under N.J.S.A. 59:8-9.

The trial court held that H.C. Equities' claims against the Authority accrued no later than March 8, 2017, when H.C. Equities stated objections to the Colliers report in its letter to the Authority. The trial court found H.C. Equities' cross-motion for leave to file a late tort claims notice under N.J.S.A. 59:8-9 to be untimely, and stated that the cross-motion presented no showing of extraordinary circumstances under that statute. The court granted the Authority's motion to dismiss H.C. Equities' claims against it.

The County moved to dismiss H.C. Equities' conspiracy and promissory estoppel claims, and H.C. Equities filed a notice of cross-motion for an extension of time to file a notice of tort claim under N.J.S.A. 58:8-9. The trial court dismissed H.C. Equities' conspiracy claim and again denied its cross-motion for an extension of time to file its tort claims notice. The court dismissed plaintiff's promissory estoppel claims without prejudice. Following the trial court's orders, H.C. Equities' only remaining claims were its breach of lease, breach and frustration of the settlement agreement, and breach of the implied covenant of good faith and fair dealing claims against the County, as well as claims asserted only against fictitious defendants.

The Appellate Division reversed, holding that plaintiff's three letters collectively constituted substantial compliance with N.J.S.A. 59:8-4's requirements. The Court granted defendants' petitions for certification. 244 N.J. 161 (2020); 244 N.J. 167 (2020).

**HELD:** A finding of substantial compliance with the Tort Claims Act cannot be premised on comments made by plaintiff's counsel in three different letters sent to lawyers representing the defendant public entities. H.C. Equities' letters, individually or collectively, did not communicate the core information that a claimant must provide to a public entity in advance of filing a tort claim. See N.J.S.A. 59:8-4. H.C. Equities did not comply with the notice of claim provisions of the Tort Claims Act or file a timely motion to submit a late claim, and the trial court was correct when it granted the motion of the Authority to dismiss H.C. Equities' claims against it, and the motion of the County to dismiss H.C. Equities' tort claims.

2

1. The Tort Claims Act's guiding principle is that immunity from tort liability is the rule and liability is the exception. The Act requires that a notice of tort claim include the information listed in N.J.S.A. 59:8-4, and it imposes a strict time limit for the filing of a notice of claim "not later than the 90th day after accrual of the cause of action," N.J.S.A. 59:8-8. A claim accrues on the date on which the underlying tortious act occurred unless the date is tolled under the discovery rule. The Tort Claims Act's strict time limitations are not absolute. The Act authorizes a court, in its discretion, to permit a claimant who has missed N.J.S.A. 59:8-8's ninety-day deadline to file a late notice "at any time within one year after the accrual of his claim provided that the public entity or the public employee has not been substantially prejudiced thereby." N.J.S.A. 59:8-9. After the expiration of that one-year period to file a late notice of claim, however, the court is without authority to relieve a plaintiff from his failure to have filed a notice of claim, and a consequent action at law must fail. A claimant applying under N.J.S.A. 59:8-9 for leave to file a late notice of claim must show "sufficient reasons constituting extraordinary circumstances." N.J.S.A. 59:8-9. Through the Tort Claims Act's notice of claim provisions, the Legislature sought to afford to public entities an opportunity to plan for potential liability and correct the underlying condition. (pp. 18-23)

2. Applying those principles and considering the timeline of events, the Court concludes that H.C. Equities' claims for trade libel and defamation against the Authority and for conspiracy against both defendants accrued no later than March 8, 2017, the date that the trial court identified as the accrual date. Accordingly, N.J.S.A. 59:8-8 required H.C. Equities to present its claim to the County and the Authority no later than June 6, 2017. H.C. Equities' notice to the County of its tort claims, however, was not served until June 13, 2017, and thus failed to comply with N.J.S.A. 59:8-8. Based on an accrual date of March 8, 2017, H.C. Equities' deadline to move for leave to file a late notice of claim under N.J.S.A. 59:8-9 was March 8, 2018. But its cross-motions seeking leave to file late claims against the Authority and the County were filed well after that deadline. Accordingly, H.C. Equities' tort claims are barred unless its counsel's letters dated February 22, 2017, March 8, 2017, and March 9, 2017 satisfy the Tort Claims Act's notice provisions by virtue of the doctrine of substantial compliance. (pp. 24-26)

3. The substantial compliance doctrine operates to prevent barring legitimate claims due to technical defects. A court deciding a substantial compliance claim considers the following factors: "(1) the lack of prejudice to the defending party; (2) a series of steps taken to comply with the statute involved; (3) a general compliance with the purpose of the statute; (4) a reasonable notice of petitioner's claim, and (5) a reasonable explanation why there was not a strict compliance with the statute." Galik v. Clara Maass Med. Ctr., 167 N.J. 341, 353 (2001). In Tort Claims Act cases, the doctrine of substantial compliance has been limited carefully to those situations in which the notice, although both timely and in writing, had technical deficiencies that did not deprive the public entity of the effective notice contemplated by the statute. (pp. 26-27)

3

4.  The Court disagrees with the Appellate Division's holding that H.C. Equities' three letters collectively establish substantial compliance with the notice requirements of the Tort Claims Act.  A substantial compliance analysis relying on plaintiff's multiple, discrete communications -- sent at different times and to different recipients -- is inconsistent with the Tort Claims Act, which consistently uses the singular when referring to "the" or "a" claim, and which reveals a legislative intent that there be one identifiable date -- not a series of dates -- on which the public entity receives notice.  A ruling that multiple documents can collectively constitute effective notice of a tort claim invites the very confusion that the Act was intended to avoid.  The Appellate Division's construction of the Act would require counsel for a public entity to review every communication received from counsel for a potential claimant and determine whether any such communication, when combined with other communications, might constitute notice of a tort claim.  That would impose an unreasonable burden on public entities. (pp. 27-29)

5.  Given the form and substance of the purported notice in this case, moreover, the factors identified in Galik do not support a finding of substantial compliance here.  First, the record does not demonstrate a "lack of prejudice to the defending party," as Galik requires.  See 167 N.J. at 353.  The letters did not alert defendants to the trade libel, defamation, and conspiracy claims that H.C. Equities would eventually assert in this action.  Second, H.C. Equities made no effort to file tort claims notices as N.J.S.A. 59:8-7 requires.  See ibid.  The third Galik factor, "a general compliance with the purpose of the statute," similarly favors a finding that H.C. Equities did not substantially comply with the Tort Claims Act.  See ibid.  The letters were inadequate to give the County and the Authority six months to review and attempt to settle the tort claims that H.C. Equities later asserted, to promptly notify the County and Authority of H.C. Equities' tort claims so that they could investigate the facts and prepare a defense, or to afford those entities an opportunity to correct; the letters similarly failed to inform defendants in advance as to the indebtedness or liability that they may be expected to meet.  See ibid.  The fourth Galik factor, "a reasonable notice of petitioner's claim," does not favor a finding of substantial compliance.  See ibid.  Even if they are considered together, the letters do not provide notice of H.C. Equities' tort claims.  Finally, H.C. Equities provided no "reasonable explanation why there was not a strict compliance with the statute."  Ibid.  There is no basis to conclude that there was substantial compliance with the Tort Claims Act's notice provisions in this case.  The trial court was correct when it granted the motion of the Authority to dismiss H.C. Equities' claims against it, and the motion of the County to dismiss H.C. Equities' tort claims.  (pp. 29-32)

**REVERSED and REMANDED to the trial court.**

**JUSTICES LaVECCHIA, ALBIN, FERNANDEZ-VINA, SOLOMON, and PIERRE-LOUIS join in JUSTICE PATTERSON's opinion.  CHIEF JUSTICE RABNER did not participate.**

4

SUPREME COURT OF NEW JERSEY

A-1/2 September Term 2020

084556

H.C. Equities, LP,

Plaintiff-Respondent,

v.

County of Union, New Jersey, and
Union County Improvement Authority,

Defendants-Appellants.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| February 2, 2021 | July 19, 2021 |

Louis N. Rainone argued the cause for appellant Union County Improvement Authority (Rainone Coughlin Minchello, attorneys; Louis N. Rainone, and John F. Gillick, on the briefs).

Thomas A. Abbate argued the cause for appellant County of Union, New Jersey (DeCotiis, Fitzpatrick, Cole & Giblin, attorneys; Thomas A. Abbate and Gregory J. Hazley, on the briefs).

A. Matthew Boxer argued the cause for respondent (Lowenstein Sandler and Gruen & Goldstein, attorneys; Fred R. Gruen, of counsel, and A. Matthew Boxer and Jarrett R. Schindler, on the briefs).

Alexander Shalom argued the cause for amicus curiae American Civil Liberties Union of New Jersey (American Civil Liberties Union of New Jersey Foundation, attorneys; Alexander Shalom, and Jeanne LoCicero, on the brief).

JUSTICE PATTERSON delivered the opinion of the Court.

The New Jersey Tort Claims Act (Act), N.J.S.A. 59:1-1 to :12-3, requires a claimant seeking to file a tort action against a local public entity or public employee to present a tort claims notice informing the entity about the potential claim. The notice must be "filed with that entity" within ninety days of the accrual of the claimant's cause of action. N.J.S.A. 59:8-7, -8. The Act, however, allows a claimant to apply to a court within one year of the accrual of the claim for leave to file a late notice of claim. Id. at -9. To secure permission to file a late notice of claim, the claimant must show that the public entity or public employee has not been substantially prejudiced by the delay and that extraordinary circumstances justify the failure to timely file. Ibid.

Plaintiff H.C. Equities, L.P. asserted contract claims against its commercial tenant, the County of Union, after the County began to withhold rent payments in response to a dispute about the condition of the leased commercial buildings. During negotiations to settle the contract matter, the County directed its co-defendant, the Union County Improvement Authority

2

(Authority), to assess the County's real estate needs. H.C. Equities obtained a copy of a consultant's report prepared as part of that assessment and objected to statements in the report about the condition of the buildings that it had leased to the County.

In February and March 2017, H.C. Equities' outside counsel wrote three letters to counsel for the County, two of which were also addressed to outside counsel for the Authority. In the letters, H.C. Equities objected to the consultant's report, requested the right to provide input for the consultant's analysis, sought to settle the prior litigation, and generally discussed the prospect of further litigation in the event that the parties' disputes were not resolved. In those letters, however, H.C. Equities did not identify, describe, or quantify its potential tort claims against either defendant.

H.C. Equities filed suit against the County and the Authority, asserting conspiracy claims against both defendants and trade libel and defamation claims against the Authority. Plaintiff did not apply for permission to file a late tort claims notice until more than eight months after the expiration of the one-year period allowed under N.J.S.A. 59:8-9 for the filing of such motions.

The trial court held that H.C. Equities had failed to file the notices of claim that the Tort Claims Act requires and dismissed its tort claims. H.C. Equities appealed, and the Appellate Division reversed the trial court's

3

determination.  Relying on a combination of excerpts from the three letters written by H.C. Equities' counsel, the Appellate Division found that H.C. Equities substantially complied with the Act's notice of claim provisions.

We disagree that in the setting of this case, a finding of substantial compliance with the Tort Claims Act can be premised on comments made by plaintiff's counsel in three different letters sent to lawyers representing the defendant public entities.  We do not find that H.C. Equities' letters, individually or collectively, communicated the core information that a claimant must provide to a public entity in advance of filing a tort claim.  See N.J.S.A. 59:8-4.  We conclude that H.C. Equities did not comply with the notice of claim provisions of the Tort Claims Act or file a timely motion to submit a late claim.

Accordingly, we reverse the Appellate Division's determination, and remand the matter to the trial court.

## I.

## A.

On December 1, 1998, H.C. Equities entered into an agreement to lease to the County two buildings in Elizabeth for a term of twenty-five years.  On July 26, 2012, the County ceased making rental payments to H.C. Equities, citing the landlord's alleged neglect of the leased properties and an electrical

4

fire that had damaged the basement in one of the buildings the previous day. Contending that the buildings were safe for occupancy, H.C. Equities asserted that the County wrongfully withheld a total of $14,846,790.16 in rent due for the period between July 26, 2012 and April 1, 2018, and that it spent $386,930.95 restoring the properties at the County's insistence.

In December 2013, H.C. Equities filed an action in the Law Division for breach of its lease agreement, seeking compensatory damages, attorneys' fees, costs, and other relief. H.C. Equities and the County conducted negotiations to settle their dispute. According to H.C. Equities, the parties agreed on all material terms of a settlement, including a twenty-year lease extension, and the agreed-upon terms were memorialized in a settlement agreement, but the settlement agreement was not executed. H.C. Equities agreed to the dismissal of its Law Division action without prejudice pending the conclusion of settlement negotiations. The County disputes H.C. Equities' contention that the matter was resolved in a binding settlement agreement.

In October 2015, at the County's behest, the Authority retained a real estate consultant, Colliers International (Colliers), and requested that it assess the County's long-term real estate needs. H.C. Equities contends that despite assurances by the County that Colliers' assessment would be a "rubber-stamp" process that would not affect the parties' settlement negotiations, the

5

consultant's report was prepared as "part of an improper and politically motivated plot to avoid the settlement terms and particularly the lease extension."

Colliers provided the County with an initial report dated January 20, 2017. H.C. Equities characterizes the report as a "draft" of Colliers' final report. The County asserts that the January 20, 2017 report was a preliminary report addressing a specific aspect of its real estate requirements, not a draft of the consultant's final report, and that Colliers' full recommendations on the County's space needs were not presented until it submitted a comprehensive report dated September 19, 2017.

Although the January 20, 2017 report was not publicly disseminated, H.C. Equities obtained a copy of it. H.C. Equities has not disclosed in the record of this appeal the precise date that it received the report. It states only that it obtained the report in "early 2017."

In the January 20, 2017 report, Colliers identified "[s]ubstantial disadvantages" in the buildings that the County leased from H.C. Equities. Colliers cited "a small and inefficient floor plate, significant physical issues, and distance from the main judiciary complex." It noted that the "[e]xtensive use of office space for file storage [was] not cost efficient," and recommended

that the County "[e]xit [the] building" and "identify alternate file storage solutions."

B.

1.

On February 22, 2017, H.C. Equities' outside counsel sent a letter to County Counsel and the Authority's outside counsel. In the letter, counsel for H.C. Equities addressed the January 20, 2017 Colliers report, stating that "[i]t was only by happenstance" that his client was "able to secure a copy of the draft document." H.C. Equities' attorney alleged that the report was "informed and influenced by parties acting in bad faith and with the intention of seeing the settlement fail." He wrote that his client "respectfully and formally requests that the Colliers Study in its present form be withdrawn from consideration by the County and the Authority, that a new, good faith analysis be conducted, and that H.C. Equities be allowed the opportunity for meaningful input into same."

After recounting the settlement negotiations between H.C. Equities and the County, H.C. Equities' counsel wrote:

> Please be advised that if the draft Collier Study is not withdrawn, then H.C. Equities will act to protect its rights in this matter. Particularly, as the study goes to the foundation of a settlement between H.C. Equities and the County, H.C. Equities will likely proceed with

7

its original claims in the Superior Court, and prosecute additional causes of action against the appropriate parties including, but not limited to, tortious interference with the settlement, tortious interference with contract and tortious interference with prospective economic advantage.

H.C. Equities' counsel added that "[in] light of this eventuality," his client demanded that the County and the Authority "preserve all documents, tangible things, and electronically stored information potentially related to this matter." He requested a litigation hold on such information, and threatened sanctions for noncompliance. Counsel requested that the County respond to the letter within three days.

2.

H.C. Equities' counsel sent a second letter dated March 8, 2017 addressed to outside counsel for the Authority, with a copy sent to County Counsel. H.C. Equities' counsel wrote that the letter was a response to a letter from the Authority's outside counsel dated February 23, 2017; the Authority's letter is not part of the record.

In his March 8, 2017 letter, H.C. Equities' counsel stated his client's position that the County had agreed to extend its lease of the disputed properties for twenty years as part of a "comprehensive final settlement" of H.C. Equities' claims, and that H.C. Equities had dismissed its prior action

8

without prejudice in reliance on the settlement. The letter stated that the County had "unilaterally determined to condition the final settlement and [settlement agreement] on its narrow study of long term space needs," and that H.C. Equities "did not agree to the unilateral modification" of the settlement agreement.

H.C. Equities' counsel contended in the March 8, 2017 letter that the Colliers report dated January 20, 2017 "bears no resemblance to [the] intended scope and focus" of the County's intended space needs analysis, and that the report's "skewed conclusions and false statements of 'fact' . . . suggest an inappropriate interference by some whose agenda was to steer Colliers to a negative conclusion that would undermine the settlement." The letter concluded:

> Our client wishes to avoid litigation to enforce the [final settlement agreement], pursue those who sought to interfere with the final execution of the [agreement], and/or the reinstatement [of] its original multimillion dollar claims. Accordingly, and per my letter of February 22nd, we respectfully request that the currently-proposed draft of the Collier Study be withdrawn in its entirety prior to any formal consideration or action on it. Once done, [H.C. Equities] must be afforded the opportunity to meet with you and Colliers to discuss scope, format, methods, assumptions, underlying criteria and facts to be addressed by the study.

9

3.

On March 9, 2017, a second law firm identifying itself as counsel for H.C. Equities sent a letter to County Counsel. The letter does not indicate that it was sent to counsel representing the Authority or to the Authority itself. In the March 9, 2017 letter, H.C. Equities' counsel stated that his client had retained the two law firms to "pursue all available remedies in connection with [the] failure of [the County] to perform a settlement agreement" arising from H.C. Equities' prior lawsuit against the County. Counsel advised the County that "[w]e will shortly be filing a civil action on behalf of [H.C. Equities] in the Superior Court of New Jersey for injunctive relief and/or [to] recover damages due [H.C. Equities] from Union County and County employees and others in connection with the Settlement Agreement or its attempted frustration."

In the March 9, 2017 letter, H.C. Equities' counsel demanded that the County "put a 'litigation hold' on all documents and other evidence directly or indirectly relevant to H.C. Equities Claims" or the commercial real estate in dispute and suspend the destruction of such documents. Counsel asserted that the County must "take such further actions as may be required to preserve all such documents and evidence," and threatened sanctions for noncompliance.

The letter concluded with an invitation to the County to contact H.C. Equities'
counsel to discuss the matter.

C.

On June 13, 2017, H.C. Equities, represented by a third law firm, served
on the County a "Notice of Tort Claim" pursuant to the Tort Claims Act. H.C.
Equities provided a copy of that Notice to outside counsel for the Authority.

In its Notice, H.C. Equities stated that it had "suffered damages arising
from tortious interference with contract, tortious interference with prospective
economic gain, violations of 42 U.S.C. § 1983 and the [New Jersey] Civil
Rights Act, [N.J.S.A. 10:6-1 to -2], violations of the Equal Protection and Due
Process Clauses of the United States Constitution, racketeering, conspiracy,
defamation, and trade libel."

II.

A.

H.C. Equities filed this action against the County and the Authority on
April 23, 2018. It asserted claims against the County for breach of lease,
"frustration and breach" of the settlement agreement that H.C. Equities
contended had resolved its prior lawsuit against the County, breach of the
implied covenant of good faith and fair dealing, conspiracy, and promissory

11

estoppel. H.C. Equities asserted claims against the Authority for trade libel, defamation, and conspiracy.

After the trial court denied defendants' initial motion to dismiss, which was premised on grounds not relevant to this appeal, H.C. Equities amended its complaint to assert additional factual allegations.

On October 5, 2018, the Authority moved to dismiss all claims asserted against it in the amended complaint, contending that H.C. Equities had failed to provide a timely notice of tort claims.

On October 30, 2018, H.C. Equities cross-moved "for retroactive extensions of time for filing of its Notice under the [Tort Claims] Act and for filing this Cross Motion." Plaintiff asserted that its cause of action against the Authority did not accrue on the date it received the January 20, 2017 Colliers report because the County and the Authority committed a continuing tort that extended beyond the receipt of that report. In the alternative, H.C. Equities argued that there were extraordinary circumstances under N.J.S.A. 59:8-9 justifying the late service of a tort claims notice, (a) because it had anticipated that the County would withdraw or supplement the Colliers report that precipitated the litigation, and (b) because neither defendant objected to the tort claims notice on timeliness grounds for more than a year.

12

At a January 25, 2019 hearing, the trial court held that H.C. Equities' claims against the Authority accrued no later than March 8, 2017, when H.C. Equities stated objections to the Colliers report in its letter to the Authority. The court concluded that H.C. Equities was therefore required to serve its tort claims notice no later than June 6, 2017, and that its June 13, 2017 tort claims notice was thus filed out of time. The trial court found H.C. Equities' cross-motion for leave to file a late tort claims notice under N.J.S.A. 59:8-9 to be untimely, and stated that the cross-motion presented no showing of extraordinary circumstances under that statute. The court granted the Authority's motion to dismiss H.C. Equities' claims against it.

On April 10, 2019, the County moved to dismiss H.C. Equities' conspiracy and promissory estoppel claims, or, in the alternative, for summary judgment dismissing those claims. Invoking the law of the case doctrine, the County argued that the trial court's identification of March 8, 2017 as the date of accrual of H.C. Equities' claims against the Authority also applied to H.C. Equities' tort claims against the County, and that the County had not waived its Tort Claims Act argument.

On April 18, 2019, H.C. Equities filed a notice of cross-motion for an extension of time to file a notice of tort claim under N.J.S.A. 58:8-9. On May 31, 2019, the trial court reiterated its prior finding that H.C. Equities' claims

13

accrued no later than March 8, 2017. The trial court dismissed H.C. Equities' conspiracy claim against the County with prejudice and again denied its cross-motion for an extension of time to file its tort claims notice, finding no reason to distinguish its ruling regarding the tort claims asserted against the County from its ruling regarding those asserted against the Authority. The court dismissed plaintiff's promissory estoppel claims without prejudice on the ground that the complaint did not state a claim for promissory estoppel on which relief could be granted; it did not reach the Tort Claims Act notice issue with respect to that claim.

Following the trial court's orders, H.C. Equities' only remaining claims were its breach of lease, breach and frustration of the settlement agreement, and breach of the implied covenant of good faith and fair dealing claims against the County, as well as claims asserted only against fictitious defendants pursuant to Rule 4:26-4.

### B.

H.C. Equities appealed the trial court's order dismissing its claims against the Authority and the court's order dismissing its claim against the County for conspiracy. The Appellate Division consolidated the appeals.

In an unpublished opinion, the Appellate Division reversed the court's determination and remanded the matter for reinstatement of the dismissed

claims. The court did not address the trial court's determination that March 8, 2017 was the accrual date of H.C. Equities' tort claims. It held, however, that H.C. Equities' letters dated February 22, 2017, March 8, 2017, and March 9, 2017 collectively constituted substantial compliance with N.J.S.A. 59:8-4's requirements.

The Appellate Division reasoned that because the letters were written by H.C. Equities' counsel to lawyers representing the County and the Authority, they satisfied the Tort Claims Act's requirement that the claimant identify itself and the public entities to be sued. The court viewed the letters as providing the County and the Authority notice of the substance of H.C. Equities' tort claims. The Appellate Division further concluded that the letters afforded sufficient notice of the amount of the claim because the February 22, 2017 letter characterized H.C. Equities' prior lawsuit as an action involving millions of dollars. The court ruled that because the County and the Authority had the opportunity to ask H.C. Equities about the intent of the letters, neither defendant was prejudiced by any lack of notice.

C.

We granted defendants' petitions for certification. 244 N.J. 161 (2020); 244 N.J. 167 (2020). We also granted the application of the American Civil Liberties Union of New Jersey to participate as amicus curiae.

15

III.

A.

The County asserts that the Appellate Division erred when it reversed the trial court's decision without determining when H.C. Equities' tort claims accrued. It contends that when the Appellate Division applied the substantial compliance doctrine, it improperly combined statements made in letters sent on different dates that did not describe the tort claims asserted against it in this case.

B.

The Authority contends that the Appellate Division expanded the substantial compliance doctrine beyond its recognized parameters. It asserts that the Appellate Division imposed on public entities' outside counsel a duty to analyze all potential claimants' correspondence to determine whether any such correspondence, alone or in combination with other communications, might be construed to constitute notice of tort claims.

C.

H.C. Equities contends that January 20, 2017, the date of Colliers' report to the County, was the earliest possible date on which its tort claims accrued. It agrees with the Appellate Division that when it sent its three letters to counsel for the County and the Authority, it substantially complied with

N.J.S.A. 59:8-4 and therefore provided tort claims notice within ninety days of the accrual of its claims.

D.

Amicus curiae the American Civil Liberties Union of New Jersey contends that the Appellate Division properly read H.C. Equities' three letters together and correctly applied the doctrine of substantial compliance in this appeal.

IV.

A.

Because the trial court relied on materials outside the pleadings to dismiss H.C. Equities' claims against the Authority and its conspiracy claim against the County, we deem its decision to be a grant of summary judgment pursuant to Rule 4:46-2, not a grant of a motion to dismiss for failure to state a claim. See R. 4:6-2(e) ("If, on a motion to dismiss based on defense (e), matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided by Rule 4:46 . . . .").

On appellate review, we apply the same Rule 4:46-2 standard that governs the trial court's decision. Allen v. Cape May County, 246 N.J. 275, 288 (2021). We construe the evidence in the light most favorable to the non-

moving party, and affirm the entry of summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c); see also Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 528-29 (1995).

In that inquiry, the "court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." McDade v. Siazon, 208 N.J. 463, 473 (2011) (quoting Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 382 (2010)). Accordingly, we review de novo whether plaintiff's claims are barred by the untimely notice or whether the doctrine of substantial compliance applies to preserve H.C. Equities' claims.

### B.

When it effected a limited waiver of sovereign immunity in the Tort Claims Act, the Legislature declared it "to be the public policy of this State that public entities shall only be liable for their negligence within the limitations of this act and in accordance with the fair and uniform principles established herein." N.J.S.A. 59:1-2. The Act's "guiding principle . . . is 'that immunity from tort liability is the general rule and liability is the exception.'"

18

D.D. v. Univ. of Med. & Dentistry of N.J., 213 N.J. 130, 133-34 (2013) (quoting Coyne v. State Dep't of Transp., 182 N.J. 481, 488 (2005)); accord McDade, 208 N.J. at 474.

The Legislature expressly barred any action against a public entity or public employee "unless the claim upon which it is based shall have been presented in accordance with the procedure set forth in this chapter." N.J.S.A. 59:8-3(a). The Act requires that a notice of tort claim include

> (a) The name and post office address of the claimant;
>
> (b) The post-office address to which the person presenting the claim desires notices to be sent;
>
> (c) The date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted;
>
> (d) A general description of the injury, damage or loss incurred so far as it may be known at the time of presentation of the claim;
>
> (e) The name or names of the public entity, employee or employees causing the injury, damage or loss, if known; and
>
> (f) The amount claimed as of the date of presentation of the claim, including the estimated amount of any prospective injury, damage, or loss, insofar as it may be known at the time of the presentation of the claim, together with the basis of computation of the amount claimed.
>
> [N.J.S.A. 59:8-4.]

19

The Act imposes a strict time limit for the filing of a notice of claim. It provides that "[a] claim relating to a cause of action for death or for injury or damage to person or to property shall be presented as provided in this chapter not later than the 90th day after accrual of the cause of action." N.J.S.A. 59:8-8.

For purposes of the Tort Claims Act, the "accrual" of a claim is "defined in accordance with existing law in the private sector." Beauchamp v. Amedio, 164 N.J. 111, 116 (2000) (citing Harry A. Margolis & Robert Novack, Claims Against Public Entities, 1972 Task Force cmt. on N.J.S.A. 59:8-1). As we have observed, "our law in the private sector" generally

> holds that a claim accrues on the date on which the underlying tortious act occurred. However, that same common law allows for delay of the legally cognizable date of accrual when the victim is unaware of his injury or does not know that a third party is liable for the injury. By operation of the discovery rule, the accrual date is tolled from the date of the tortious act or injury when the injured party either does not know of his injury or does not know that a third party is responsible for the injury.
>
> [Ben Elazar v. Macrietta Cleaners, Inc., 230 N.J. 123, 134 (2017) (citations omitted).]

See also McDade, 208 N.J. at 475.

A claimant must then wait six months from "the date notice of claim is received" to "file suit in an appropriate court of law." N.J.S.A. 59:8-8. With exceptions that do not apply here, the Tort Claims Act provides that

> [t]he claimant shall be forever barred from recovering against a public entity or public employee if:
>
> a. The claimant failed to file the claim with the public entity within 90 days of accrual of the claim except as otherwise provided in N.J.S.A. 59:8-9; or
>
> b. Two years have elapsed since the accrual of the claim; or
>
> c. The claimant or the claimant's authorized representative entered into a settlement agreement with respect to the claim.
>
> [Ibid.]

The Tort Claims Act's strict time limitations are not absolute. "[T]he Legislature recognized that discretionary judicial relief from the ninety-day Tort Claims Act requirement may be necessary to ameliorate the consequence of a late filing in appropriate cases." McDade, 208 N.J. at 476. The Act authorizes a court, in its discretion, to permit a claimant who has missed N.J.S.A. 59:8-8's ninety-day deadline to file a late notice "at any time within one year after the accrual of his claim provided that the public entity or the public employee has not been substantially prejudiced thereby." N.J.S.A. 59:8-9. After the expiration of that one-year period to file a late notice of

21

claim, however, "the court is without authority to relieve a plaintiff from his failure to have filed a notice of claim, and a consequent action at law must fail." Rogers v. Cape May Cnty. Off. of Pub. Def., 208 N.J. 414, 427 (2011) (quoting Pilonero v. Township of Old Bridge, 236 N.J. Super. 529, 532 (App. Div. 1989)).

A claimant applying under N.J.S.A. 59:8-9 for leave to file a late notice of claim must show "sufficient reasons constituting extraordinary circumstances for his failure to file notice of claim within the period of time prescribed by [N.J.S.A. 59:8-8] or to file a motion seeking leave to file a late notice of claim within a reasonable time thereafter." N.J.S.A. 59:8-9.[1]

The Legislature did not enact the Tort Claims Act's strict timing requirements "as 'a trap for the unwary.'" Lowe, 158 N.J. at 629 (quoting Murray v. Brown, 259 N.J. Super. 360, 365 (Law Div. 1991)). Rather, those requirements serve the Legislature's objectives

> (1) "to allow the public entity at least six months for administrative review with the opportunity to settle meritorious claims prior to the bringing of suit"; (2) "to provide the public entity with prompt notification of a claim in order to adequately investigate the facts and

---

[1] The Legislature replaced its prior standard for motions for leave to file late claims, which required only a showing of "sufficient reasons" for the delay, with the more stringent "sufficient reasons constituting extraordinary circumstances" standard that governs today. L. 1994, c. 49, § 5; see also Lowe v. Zarghami, 158 N.J. 606, 625 (1999) ("The Legislature enacted a more demanding standard when the [Tort Claims Act] was amended in 1994 . . . .").

prepare a defense"; (3) "to afford the public entity a chance to correct the conditions or practices which gave rise to the claim"; and (4) to inform the State "in advance as to the indebtedness or liability that it may be expected to meet."

[Beauchamp, 164 N.J. at 121-22 (first two quotations from 1972 Task Force cmt. on N.J.S.A. 59:8-3; second two quotations from Fuller v. Rutgers, State Univ., 154 N.J. Super. 420, 426 (App. Div. 1977)).]

Thus, when it enacted the Tort Claims Act's notice of claim provisions, "the Legislature sought to afford to public entities an 'opportunity to plan for potential liability and correct the underlying condition.'" O'Donnell v. N.J. Tpk. Auth., 236 N.J. 335, 345 (2019) (quoting Jones v. Morey's Pier, Inc., 230 N.J. 142, 155 (2017)). Those provisions "compel a claimant to expose his intention and information early in the process in order to permit the public entity to undertake an investigation while witnesses are available and the facts are fresh." Gomes v. County of Monmouth, 444 N.J. Super. 479, 488 (App. Div. 2016) (quoting O'Neill v. City of Newark, 304 N.J. Super. 543, 549 (App. Div. 1997)).

### C.

We apply the Tort Claims Act's notice of claim provisions to the setting of this appeal.

23

1.

We first determine when H.C. Equities' claims accrued, applying the discovery rule as "part and parcel of such an inquiry because it can toll the date of accrual." Beauchamp, 164 N.J. at 118.

H.C. Equities asserted claims for trade libel and defamation against the Authority and a conspiracy claim against both defendants. As the amended complaint makes clear, both claims are premised on the first Colliers report, dated January 20, 2017.

The parties disagree about the date on which H.C. Equities became aware of the contents of that first report, and the record is incomplete on that issue. There is no dispute, however, that when H.C. Equities wrote to counsel for both defendants on February 22, 2017, it had the January 20, 2017 Colliers report in its possession, as its counsel stated in the letter. The letter also made clear that H.C. Equities had concluded that the report contained false statements about the disputed properties, and that H.C. Equities read the report as reflecting the influence of parties acting in bad faith and with the intention to thwart plaintiff's settlement with the County. Thus, when its counsel wrote to the County and the Authority on February 22, 2017, H.C. Equities was aware of its alleged injuries and had identified the parties it considered liable for those injuries. In its letter of March 8, 2017, directed to counsel for the

24

Authority, H.C. Equities reiterated that it viewed the County and the Authority to be liable for its injuries.

Invoking the discovery rule to toll the accrual date, and viewing the record in the light most favorable to H.C. Equities as Rule 4:46-2 requires, we conclude that H.C. Equities' claims for trade libel and defamation against the Authority and for conspiracy against both defendants accrued no later than March 8, 2017, the date that the trial court identified as the accrual date. Accordingly, N.J.S.A. 59:8-8 required H.C. Equities to present its claim to the County and the Authority no later than June 6, 2017. H.C. Equities' notice to the County of its tort claims, however, was not served until June 13, 2017, and thus failed to comply with N.J.S.A. 59:8-8.

Based on an accrual date of March 8, 2017, H.C. Equities' deadline to move for leave to file a late notice of claim under N.J.S.A. 59:8-9 was March 8, 2018. Its cross-motion seeking leave to file a late claim against the Authority was filed on October 30, 2018, almost eight months after that deadline. Moreover, plaintiff did not file its cross-motion pursuant to N.J.S.A. 59:8-9 as to the County until April 18, 2019, more than a year after the deadline.

Accordingly, H.C. Equities' tort claims are barred unless its counsel's letters dated February 22, 2017, March 8, 2017, and March 9, 2017 satisfy the

25

Tort Claims Act's notice provisions by virtue of the doctrine of substantial compliance.

2.

The substantial compliance doctrine "operates 'to prevent barring legitimate claims due to technical defects.'" County of Hudson v. Dep't of Corr., 208 N.J. 1, 21 (2011) (quoting Lebron v. Sanchez, 407 N.J. Super. 204, 215 (App. Div. 2009)).

A court deciding a substantial compliance claim considers the following factors:

> (1) the lack of prejudice to the defending party; (2) a series of steps taken to comply with the statute involved; (3) a general compliance with the purpose of the statute; (4) a reasonable notice of petitioner's claim, and (5) a reasonable explanation why there was not a strict compliance with the statute.
>
> [Galik v. Clara Maass Med. Ctr., 167 N.J. 341, 353 (2001) (quoting Bernstein v. Bd. of Trs., TPAF, 151 N.J. Super. 71, 76-77 (App. Div. 1977)).]

In Tort Claims Act cases, the doctrine of substantial compliance "has been limited carefully to those situations in which the notice, although both timely and in writing, had technical deficiencies that did not deprive the public entity of the effective notice contemplated by the statute." D.D., 213 N.J. at 159. In that setting, "substantial compliance means that the notice has been given in a way, which though technically defective, substantially satisfies the

26

purposes for which notices of claims are required." Lebron, 407 N.J. Super. at 216 (quoting Lameiro v. W. N.Y. Bd. of Educ., 136 N.J. Super. 585, 588 (Law Div. 1975)).

3.

We disagree with the Appellate Division's holding that H.C. Equities' three letters collectively establish substantial compliance with the notice requirements of the Tort Claims Act.

In that inquiry, we first note that a substantial compliance analysis relying on plaintiff's multiple, discrete communications -- sent at different times and to different recipients -- is inconsistent with the Tort Claims Act. The Legislature clearly envisioned that a claimant would disclose to a public entity its tort causes of action in a single document that provides clear notice of its claim, not in a series of incomplete communications that must be considered together in order to infer that a claim may be filed.

Even if the letters collectively set forth enough of the information required under N.J.S.A. 59:8-4 to substantially comply with that statute -- which they do not, as discussed infra -- it is inherently problematic to conclude that a collection of letters can, together, substantially comply with the notice requirement. The Tort Claims Act consistently uses the singular. See N.J.S.A. 59:8-4 (setting forth the requirements of "the claim" under the Tort Claims

27

Act); <u>id.</u> at -5 (requiring that "the claim" be signed by the claimant or someone on his behalf); <u>id.</u> at -7 (mandating the filing of "[a] claim" with a local public entity); <u>id.</u> at -8 (setting forth timing requirements for the presentation of "[a] claim)." And the Legislature's express purpose to "provide the public entity with prompt notification of a claim," <u>Beauchamp</u>, 164 N.J. at 121, is not met if the public entity is required to analyze multiple communications and determine whether, viewed in the aggregate, they reveal an intent to sue.

In addition, the Legislature clearly intended that there be one identifiable date -- not a series of dates -- on which the public entity receives notice. The date of notice marks the beginning of a six-month waiting period that precedes the filing of the action. <u>See</u> N.J.S.A. 59:8-8 (providing that the claimant may not file suit until "[a]fter the expiration of six months from the date notice of claim is received"); <u>Beauchamp</u>, 164 N.J. at 121 (noting the Legislature's purpose "to allow the public entity at least six months for administrative review with the opportunity to settle meritorious claims prior to the bringing of suit" (quoting 1972 Task Force cmt. on N.J.S.A. 59:8-3)). A ruling that multiple documents can collectively constitute effective notice of a tort claim invites the very confusion that the Act was intended to avoid.

That concern is particularly relevant because the statements deemed by the Appellate Division to satisfy the Act's requirements were made in routine

28

correspondence between lawyers engaged in the potential resolution of an ongoing dispute. The Appellate Division's construction of the Act would require counsel for a public entity to review every letter, e-mail, or other communication received from counsel for a potential claimant and determine whether any such communication, when combined with other communications, might constitute notice of a tort claim. In the case of the Authority, which was not copied on the March 9, 2017 letter, the Appellate Division's decision would require a public entity's counsel to monitor the claimant's correspondence with a different public entity. The ruling would thus impose an unreasonable burden on public entities.

Given the form and substance of the purported notice in this case, moreover, the substantial compliance factors identified in Galik do not support a finding of substantial compliance here.

First, the record does not demonstrate a "lack of prejudice to the defending party," as Galik requires. See 167 N.J. at 353. The letters did not alert defendants to the trade libel, defamation, and conspiracy claims that H.C. Equities would eventually assert in this action. The prejudice to the Authority was particularly significant because its counsel was not copied on the final letter -- the only communication that expressly revealed H.C. Equities' intention to file a new action.

29

Second, the record does not reveal "a series of steps taken to comply with the statute involved." Ibid. This is not a case in which a claimant attempted to satisfy N.J.S.A. 59:8-7's mandate that it file its claim with the local public entity but fell short of that requirement because of a mistake or technical deficiency. Here, H.C. Equities made no effort to file tort claims notices with the public entities as N.J.S.A. 59:8-7 requires.

The third Galik factor, "a general compliance with the purpose of the statute," similarly favors a finding that H.C. Equities did not substantially comply with the Tort Claims Act. See ibid. The letters were inadequate to give the County and the Authority six months to review and attempt to settle the tort claims that H.C. Equities later asserted, to promptly notify the County and Authority of H.C. Equities' tort claims so that they could investigate the facts and prepare a defense, or to afford those entities an opportunity to "correct the conditions or practices that gave rise to the [tort] claim[s]." See Beauchamp, 164 N.J. at 121-22. Devoid of any reference to the scope of H.C. Equities' damages claim arising from the alleged torts, the letters similarly failed to serve the final objective of the Tort Claims Act, to inform the public entities in advance "as to the indebtedness or liability that [they] may be

30

expected to meet." Id. at 122 (quoting Fuller, 154 N.J. Super. at 426).[2]  As applied in the setting of this appeal, the Appellate Division's application of the substantial compliance doctrine would defeat the Legislature's purpose of promoting transparency and clarity in the presentation of tort claims against public entities.

The fourth Galik factor, "a reasonable notice of petitioner's claim," does not favor a finding of substantial compliance.  See 167 N.J. at 353.  Even if they are considered together, the letters do not provide notice of H.C. Equities' tort claims.

In the letters, H.C. Equities' counsel addressed alleged inadequacies in the process that led to the January 20, 2017 Colliers report and inaccuracies in the report itself; counsel also demanded the withdrawal of that report.  In its February 22, 2017 and March 9, 2017 letters, H.C. Equities demanded the preservation and retention of documents relevant to the parties' dispute.  Neither the demand for a retraction nor the references to a litigation hold notice, however, substantially comply with N.J.S.A. 59:8-4's requirement that a claimant provide notice that it intends to file a tort claim.

---

[2]  H.C. Equities' only mention of the amount of damages it sought, which appeared in its March 8, 2017 letter, was a reference to the "original multimillion dollar" contract claims asserted in its prior action against the County, and is plainly unrelated to any potential tort claims.

31

In its February 22, 2017 letter, H.C. Equities stated that if the Colliers report were not withdrawn, it would "likely proceed" with the contract claims it had asserted against the County in its first litigation and would "prosecute additional causes of action," including, but not limited to, tortious interference claims, against "the appropriate parties."  In its March 9, 2017 letter directed only to the County, H.C. Equities generally stated that it intended to file a civil action "for injunctive relief and/or recover damages due" from the County. There is no description of the "injury, damage or loss" that H.C. Equities allegedly incurred as a result of any tortious conduct.  See N.J.S.A. 59:8-4. The fourth Galik factor is unsatisfied here.

Finally, H.C. Equities provided no "reasonable explanation why there was not a strict compliance with the statute."  Galik, 167 N.J. at 353.  In this case, the claimant is a sophisticated business represented by skilled counsel.  It has presented no showing as to why it was not in a position to file a tort claims notice against the County or the Authority.

In sum, we find no basis to conclude that there was substantial compliance with the Tort Claims Act's notice provisions in this case.  We therefore hold that the trial court was correct when it granted the motion of the Authority to dismiss H.C. Equities' claims against it, and the motion of the County to dismiss H.C. Equities' tort claims.

## V.

The judgment of the Appellate Division is reversed, and the matter is remanded to the trial court for further proceedings in accordance with this opinion.


JUSTICES LaVECCHIA, ALBIN, FERNANDEZ-VINA, SOLOMON, and PIERRE-LOUIS join in JUSTICE PATTERSON's opinion. CHIEF JUSTICE RABNER did not participate.